**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

BRANDON RUDKIN,                         )
                                        )
      Plaintiff,                      )
                                        )
v.                                      )        Case No. 05-1156-WEB
                                        )
SEDGWICK COUNTY, KANSAS,                )
                                        )
      Defendant.                      )

<u>MEMORANDUM AND ORDER</u>

Now before the Court is Defendant's motion for summary judgment.  Fed. R. Civ. P. 56; (Doc. 34).  Plaintiff has alleged a claim pursuant to 42 U.S.C. § 1983 and a state law claim for false imprisonment.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

<u>I.  Standard.</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims..." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). The Court views the evidence and all reasonable inferences in favor of the non-moving party.  *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1108 (10th Cir. 2001).  A fact is "material" if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  *Id.*  A genuine factual dispute requires more than a mere scintilla of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler,* 144 F.3d at 670-671.  The movant can do this by demonstrating a lack of evidence on an essential element of the nonmovant's claim.  *Id.* at 671.  "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing Fed. R. Civ. P. 56(e)).

"To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F. 3d at 671 (internal citations and quotations omitted).  The nonmoving party cannot defeat a properly supported motion for summary judgment by relying on conclusory allegations; rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson*, 477 U.S. at 256.

"[A]s previously noted in this district, 'the particular forms of evidence mentioned in [Rule 56] are not the exclusive means of presenting evidence on a [summary judgment] motion.  The court may consider any material that would be admissible or usable at trial.'" *Arceo v. City of Junction City,* 182 F. Supp. 2d 1062, 1080 (D. Kan. 2002) (quoting *Wright v. Wyandotte County Sheriff's Dept.,* 963 F. Supp. 1029, 1035 (D. Kan. 1997)).

## II. Facts.

1.  Darren Rudkin (Darren) is the identical twin brother of the Plaintiff, Brandon Rudkin

(Brandon).  They were born one minute apart on October 1, 1983.

2.  On January 19, 2002, Darren was arrested by police for alleged domestic violence (ie., battery of his brother, Brandon).  As a result of his arrest, Darren was booked into the Sedgwick County Adult Detention Facility (the jail), a facility operated by Defendant.  Jail booking records have a place for sheriff deputies to note scars, marks, or tattoos of individuals being booked into jail. No scars, marks, or tattoos were documented on Darren's booking records for January 19, 2002. Jail mug shots of Darren were taken on that occasion and kept with his jail records.  (Def. Ex. 5).

3.  Less than a month later, Darren was arrested by police on February 9, 2002 and charged with underage drinking and obstructing an officer.  No scars, marks, or tattoos are indicated on Darren's jail booking records made on February 9, 2002.

4.  Darren was shortly thereafter arrested by police on February 28, 2002.  His arrest was once more for alleged domestic violence. (ie., battery of his brother).  Darren's jail booking records made on February 28, 2002, do not indicate that he had any scars, marks, or tattoos.  (Def Ex. 10).

5.  On February 15, 2003, Darren was arrested and charged with driving under the influence of alcohol and several other offenses.  One of the charges was that Darren presented Brandon's (Plaintiff's) driver's license to the officer.  Darren admits that he had Plaintiff's driver's license at the time and handed it to the officer when he was stopped.  Darren maintains that after the officer arrested him, he advised the officer of his true identity.  The jail booking records for Darren's arrest on February 15, 2003 note a tattoo on his back and a scar on his abdomen.  No other details regarding the tattoo or scar were noted.  (Def. Ex. 14).

6.  Darren had used Plaintiff's driver's license at times and had misidentified himself to police at times as Plaintiff, including during this 2003 arrest.  Darren testified that before that arrest,

he had used Plaintiff's driver's license several times on weekends to go to clubs because the back piece was ripped off of Darren's own license.  Darren has further testified that he would sometimes keep Plaintiff's license for a month at a time without Plaintiff's knowledge.

7.  On October 25, 2004, Darren received a traffic ticket for an expired tag and no proof of insurance.  He was not arrested or booked into jail.  When Darren subsequently failed to appear at the hearing in state court on that ticket, a warrant was issued for his arrest.  The warrant listed "Brandon Rudkin" as an alias used by Darren.  The warrant listed Darren as having a tattoo on his back and a scar on his abdomen.  (Def. Ex. 15).

8.  The arrest warrant was still outstanding on January 18, 2005, when at approximately 7:55p.m. a Wichita police officer, Darren Sundquist (Sundquist), stopped Plaintiff for exhibition of speed and no proof of insurance.  Earlier that same day, Plaintiff had been terminated from his job and he was on his way to play basketball.  At the time he was stopped, Plaintiff did not have his driver's license or his wallet in his possession.  The only identification Plaintiff had was some mail addressed to him.

9.  Plaintiff told Sundquist his name, social security number, date of birth, and address.  Sundquist then checked with a City of Wichita agency, SPIDER, and received information that the state court had an arrest warrant for Darren Rudkin which listed Brandon Rudkin as an alias.  On the basis of the warrant and pursuant to his supervisor's authority, Sundquist arrested Plaintiff, placed him in handcuffs, and took him to jail.  After Plaintiff had been placed in the back seat of Sundquist's patrol car, Sundquist checked Plaintiff for a scar on his abdomen and tattoos on his back.  Sundquist was talking on the phone and remarked "No" to whomever he was talking on his cell phone.

4

10.   Sundquist and Plaintiff arrived at the jail at approximately 9:00 p.m. on January 18, 2005.  They went first to a pre-booking area.  While in this pre-booking area, some sheriff deputies (i.e., employees of Sedgwick County) came into that area.  Plaintiff told the deputies that he was not Darren.  The deputies told Plaintiff that he could call Darren and if Darren confirmed Plaintiff's identity, then Plaintiff could leave.

11.   Plaintiff was then allowed three (possibly four) telephone calls to try to reach Darren while Plaintiff was still in the pre-booking area.  Plaintiff's first phone call was to Darren's cell phone but Darren did not answer.  Plaintiff left a message for Darren to call him back.

12.   Plaintiff next called Darren's girlfriend.  She also did not answer so Plaintiff again left a message for Darren to call him back.  Plaintiff's third phone call was to Darren's roommate.  The roommate answered and Plaintiff told him why he needed to contact Darren.  The roommate said he would try to reach Darren.  Plaintiff also possibly called another friend of Darren's during that time without success.

13.   Plaintiff was then taken to the booking area of the jail.  In that area, he was first asked questions on a medical assessment form.

14.   From there, Plaintiff was taken to the booking counter.  Prior to booking, deputies compared Darren's mug shots (which they viewed on a computer screen) to Plaintiff's appearance.  Deputies also checked to see if Plaintiff had a tattoo on his back or a scar on his abdomen.  He did not.  Deputies would not have been able to tell from Darren's mug shots what kind of back tattoo or abdomen scar Darren had.  Those marks were not visible in the mug shots.  Darren's shunt is visible in three mug shots.  (Def. Ex. 8, 10, 14).

15.   Plaintiff told deputies about a shunt (ie., tube) which had been inserted underneath

5

Darren's skin when he was a baby and which runs from behind his ear to his abdomen.  Deputies

said they saw the shunt in Darren's mug shots.  Plaintiff showed deputies his driver's license which

his wife, Erica, had brought to Sundquist when she went to pick up Plaintiff's vehicle at the scene

of the arrest.  Officer Simmons had a feeling the outstanding warrant was not for Brandon Rudkin.

(Pl. Ex. C at 16: 9 to 17: 2).

16.    Deputies asked Plaintiff if there were any other physical characteristics which

distinguished Darren and Plaintiff.  Plaintiff told them Darren had a small scar above his eye.  The

deputies said they could not see that scar in Darren's mug shots.  They are not visible from a

photograph.

17.  Except to the extent it is visible in the photographs, the jail booking records for Darren's

prior arrests do not document a shunt under scars, marks, or tattoos.

18.  Sgt. Gerald Pewewardy (Pewewardy) was the supervisor in charge of the booking area

that evening.  He first became aware of Plaintiff when he noticed three deputies comparing mug

shots on a computer screen to Plaintiff.  The deputies said they were trying to determine which

Rudkin twin they had.

19.  Pewewardy testified that there have been several occasions in his experience at the jail

in which one member of a set of twins was arrested and falsely claimed to deputies to be the other

twin.

20.  Pewewardy looked at Darren's mug shots and was unable to tell any difference between

them and Plaintiff's appearance.  Pewewardy was unable to see a shunt in Darren's photos.

Pewewardy directed the deputies to book the Plaintiff and obtain his fingerprints so his identity

could be determined.  Pewewardy called the Records Department in the Sheriff's Office to request

that Plaintiff's fingerprints be classified and compared to Darren's fingerprints already on file. However, none of the personnel trained for that function were on duty at that time of night.

21.  Pewewardy was advised in that telephone call that the Records Department would fax Plaintiff's fingerprints to the FBI for identification.  Plaintiff's fingerprints were then hand carried to the Records Department.  Sometime before 11:15 p.m., the fingerprint report came back from the FBI indicating Plaintiff's fingerprints did not match any in its record system.

22.  According to Pewewardy, the only means available to Plaintiff to be released based on the lack of scar and tattoo was for that information to be delivered to a lieutenant.  (Def. Ex. 10 at 17: 18 to 18: 7).  Pewewardy did not go to the lieutenant with this information because he was waiting on the fingerprint report.  (Id.).  No one noticed when the fingerprint report arrived; hence, no one ever went to the lieutenant.  (Id. at 19: 3-13).  According to Pewewardy, no matter what came back on the fingerprint report, Plaintiff could only be released by posting bond or going in front of a judge.  (Id. at 15: 23 to 17: 12).  At about 11:15 p.m., Pewewardy and the other deputies ended their shift.  A different booking supervisor and new group of deputies then operated the booking area.

23.  After Plaintiff had been fingerprinted, his mug shots were taken and he was placed in a holding cell by himself in the booking area.  Plaintiff remained in the holding cell until he was released.  Another individual was placed in the same cell about 30 minutes before Plaintiff's release.

24.  Plaintiff was never threatened or assaulted while he was in jail.  Deputies made rude comments.  (Def. Ex. 1 at 73: 7-9).  One of the deputies said to Plaintiff, "you need to tell your brother to get his F'g shit straight or you fuck him up."  (Def. Ex. 1 at 76: 21-24).  The same deputy also commented that they should throw Plaintiff in jail to teach his brother a lesson.  (Def. Ex. 1 at

77: 8-9).  Another officer told Plaintiff "why don't you sit back there and shut up and we'll figure

this out."  (Def. Ex. 1 at 77: 21-23).  One of the deputies told Plaintiff, "That if it is not your fucking

warrant call your fucking brother and have him come up here, and I know I would kick my brother's

ass if he did that to me."  (Def. Ex. A).

25.  Plaintiff was allowed to call his wife, Erica, at about 10:37 p.m. and again at about 11:59

p.m.  Darren received Plaintiff's message and he called the jail.  Darren spoke with an unidentified

deputy who asked if Darren was going to bail his brother out.  Darren told the deputy he would be

there in a little bit; however, he never went to the jail for fear that he would be arrested.

26.  Plaintiff was released on bond at approximately 1:30 a.m. on January 19, 2005.

Plaintiff's wife paid $250.00 to a bondsman for the bond which was drawn from a joint banking

account owned by both Plaintiff and his wife.

27.  Plaintiff was at the jail a total of about 4.5 hours before his release.

28.  At a later date, Plaintiff's attorney discussed with the prosecutor in Darren's case that

Plaintiff had been arrested by mistake on Darren's warrant.  In a journal entry, Plaintiff was excused

from any further appearance in Darren's case.  Plaintiff's attorney was a family friend and did not

charge Plaintiff for this service.

29.  Sedgwick County has stipulated that its personnel were acting under color of state law

when they detained Plaintiff at the jail.  Plaintiff has stipulated that Defendant Sedgwick County is

not responsible or liable for any actions of Sundquist, SPIDER or the City of Wichita for arresting

or delivering Plaintiff to jail.


### III. Governing law under section 1983.

8

Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983.

A city is not liable under section 1983 if there is no underlying constitutional violation; consequently, the Court will first analyze this issue. *Thompson v. City of Lawrence, Kan.*, 58 F.3d 1511, 1517 (10th Cir. 1995). The pretrial order shows Plaintiff alleges Defendant violated his rights under the Fourteenth Amendment. Plaintiff claims his post-arrest detention was unlawful once deputies discovered he was not the person named in the warrant.

The Supreme Court has provided guidance for section 1983 actions for arrests based on mistaken identity. *Baker v. McCollan*, 443 U.S. 137 (1979). In *Baker*, Leonard and Linnie McCollan were brothers. Leonard was arrested but masqueraded as Linnie McCollan. After released on bond, a warrant was issued in Linnie's name for Leonard. A couple months later, Linnie was stopped for a traffic violation. A warrant check revealed that a person by the name of Linnie McCollan was wanted. Despite Linnie's protests of mistaken identity, he was arrested and remained in jail for three days until officials recognized the error and released him.

Under these circumstances, the Supreme Court found no constitutional violation. The Court stated:

> The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished "without due process of law." A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers...is entirely consistent with "due process of law." Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is

9

based on mistaken identity...  The ultimate determination of such claims of innocence is placed in the hands of the judge and jury.

*Id*. at 145-146.

However, the Court acknowledged the possibility of a Fourteenth Amendment substantive due process violation.  "[D]epending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of liberty...without due process of law."  *Id.* (internal quotations omitted).

Unlike *Baker,* police in this case did investigate Plaintiff's allegations of innocence and did discover evidence showing he was not the person named in the warrant.  Under these circumstances courts have disagreed on the existence of a due process right of a detainee to be free from continued pre-trial detention despite authorities having knowledge that the detainee is innocent.  *Brady v. Dill*, 187 F.3d 104, 115 (1st Cir. 1999) (no right); *Id.* (Pollak, concurring) (finding right); *Kennell v. Gates*, 215 F.3d 825 (8th Cir. 2000) (finding right); *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 184 n. 6 (4th Cir. 1996) (no right), *Cannon v. Macon County*, 1 F.3d 1558 (11th Cir. 1993) (finding right); see *Gray v. Cuyahoga County Sheriff's Dept.,* 150 F.3d 579, 583 (6th Cir. 1998) (finding right).

An analysis of Supreme Court decisions in the area of substantive due process is helpful. "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. Harker Heights,* 503 U.S. 115, 125 (1992).  "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."  *Albright v. Oliver*, 510 U.S. 266, 272 (1994).

Petitioner's claim to be free from pre-trial detention absent probable cause is not among in the above areas in which substantive due process rights have been recognized.  *Id.* (denying petitioner's claim for a substantive due process right to be free from prosecution except on the basis of probable cause); see *Brooks*, 85 F.3d at 184 n. 6.  Given the reluctance of the Supreme Court to recognize new substantive due process rights the Court finds persuasive the reasoning in the majority opinion in *Brady*.  *Brady,* 104 F.3d at 106-117.

In *Brady*, plaintiff was arrested on a valid warrant bearing his name.  *Id.* at 106.  While in pre-trial custody, plaintiff asserted his innocence and jailors noticed discrepancies between the information in the arrest report and plaintiff.  *Id.* at 107.  Plaintiff had a tattoo and his mother's maiden name "Kowalski", whereas the arrest report noted no tattoos and a mother's maiden name of "Kozloski".  *Id.*  Furthermore, the height, weight, hair, and eye color did not precisely match.  *Id.*  Plaintiff remained in jail for a day and a half and charges were eventually dropped.  *Id.*  Plaintiff brought an action under section 1983 alleging violations of the Fourteenth Amendment.

The First Circuit found the plaintiff had not asserted a due process right.  The court stated:

> Important considerations undergird the separation of functions recognized in *Baker*..., and those considerations are at their zenith when a person who is named in a facially valid warrant, supported by probable cause, is arrested pursuant to that warrant.  When such a person asserts that he is a victim of mistaken identities, he in effect is pressing a claim of innocence in fact-a claim not analytically distinct from any other factual defense...Regardless of the merits of the defense, our legal system simply does not rely on police officers to determine its bona fides, even though they may have information bearing on that ultimate question...To the contrary, once probable cause has been established, a warrant issued, and an arrest perfected, the ordinary course is for the prosecutor to decide whether to go forward, and if he elects to proceed, for the judicial branch to make the final ascertainment of guilt or innocence-not for the police to take the matters into their own hands.

*Id.* at 111-112.

The Court agrees with *Brady* that the substantive due process right advocated by Plaintiff would pose problems.

11

[A] warrant is a judicial order authorizing an arrest, and, as long as the police are acting in compliance with that order, it is surpassingly difficult to fathom why the proper method for challenging the ensuing detainment should be something other than a prompt hearing before a magistrate...Among other things, a contrary rule would create an incentive for police officers not to investigate claims of innocence at all, for fear of incurring liability should they uncover information that would cast doubt on the putative offender's guilt.

Perhaps more insidious, [plaintiff's] position has the potential of turning police stations into tribunals for making preliminary determinations of guilt or innocence-an eventuality that *Baker* explicitly disavows...Such a happenstance would pose a much greater danger to an ordered conception of liberty than the occasional snafu that the separation of functions regime thus far has produced.

*Id.* at 113-114.

The Tenth Circuit has not directly addressed facts identical to those in the case sub judice and *Brady*; however, its decision in *Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995) is helpful.  In *Romero*, the plaintiff sued police officers for, *inter alia*, violating his constitutional rights by falsely imprisoning him because they failed to release him despite his claims of innocence.  In granting summary judgment for defendants, the Tenth Circuit emphasized *Baker*'s holding that "the ultimate determination of such claims of innocence is placed in the hands of the judge and the jury."  *Id.* at 1480.

Given the reluctance of the Supreme Court to find new substantive due process rights, *Romero*'s and *Baker*'s reliance on the separation of functions, and the persuasive reasoning in *Brady*, the Court holds that a person arrested pursuant to a valid warrant suffers no violation of his substantive due process rights when police continue the detention for a reasonable time even after ascertaining that the detainee is innocent.[1]   As a result, the Court grants summary judgment to

---

[1] Even if this Court were to recognize a substantive due process right for the deprivation of liberty from a mistaken pre-trial detention, Plaintiff's detention of four and a half hours is insufficient to violate this right.  See *Baker*, 443 U.S. at 145 (after a certain amount of time, pretrial detention of a person mistakenly identified will violate substantive rights; however, detention over a period of three days is insufficient to violate due process rights).

Defendant.

IV.  State law claim for false imprisonment.

Plaintiff has also asserted a state law claim for false imprisonment. The Court's subject matter jurisdiction over this claim is predicated on supplemental jurisdiction under 28 U.S.C. § 1367(a).  (Doc. 1 at ¶ 3).  There is no diversity of citizenship.  (Id. at ¶ 1).  Because the Court has granted summary judgment on Plaintiff's federal claim, the Court will determine whether to exercise its supplemental jurisdiction over the remaining state law claim.

"The district court[] may decline to exercise supplemental jurisdiction over a claim under subsection (a) if- (c) the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  It is within the sound discretion of the district court to exercise supplemental jurisdiction.  *Medina v. City of Osawatomie,* 992 F. Supp. 1269, 1279 (D. Kan. 1998).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."  *McWilliams v. Jefferson County,* 463 F.3d 1113, 1118 (10th Cir 2006) (quoting *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7 (1988)).

The Court finds no compelling reasons to exercise supplemental jurisdiction to decide the merits of Plaintiff's state law claim.  See *Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990) (notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary).  In the interest of comity and federalism, the Court dismisses Plaintiff's state law claim for false imprisonment without prejudice.

13

Defendant's Motion for Summary Judgment (Doc. 34) is GRANTED. It is further ORDERED that plaintiff's state law claim for false imprisonment be dismissed without prejudice. The Clerk is directed to enter judgment for Defendant.

SO ORDERED this 10th day of January 2007.

 s/ Wesley E. Brown

Wesley E. Brown, U.S. Senior District Judge

14